# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

### *IN RE* ADVOCATE AURORA HEALTH PIXEL LITIGATION

| | |
|---|---|
| SHYANNE JOHN, DERRICK HARRIS, AMBER SMITH, KATRINA JONES, JAMES GABRIEL, and BONNIE LAPORTA, <br><br> Plaintiffs, <br><br> v. <br><br> ADVOCATE AURORA HEALTH, INC., <br><br> Defendant. | Case No. 22-CV-1253-JPS <br><br><br> **ORDER** |
| RICHARD WEBSTER, <br><br> Plaintiff, <br><br> v. <br><br> ADVOCATE AURORA HEALTH, INC., <br><br> Defendant. | Case No. 22-CV-1278-JPS |
| DEANNA DANGER, <br><br> Plaintiff, <br><br> v. <br><br> ADVOCATE AURORA HEALTH, INC., <br><br> Defendant. | Case No. 22-CV-1305-JPS |

| | |
|---|---|
| ANGEL AJANI, <br><br>         Plaintiff, <br><br> v. <br><br> ADVOCATE AURORA HEALTH, INC., <br><br>         Defendant. | Case No. 23-CV-259-JPS |
| ALISTAIR STEWART, <br><br>         Plaintiff, <br><br> v. <br><br> ADVOCATE AURORA HEALTH, INC., <br><br>         Defendant. | Case No. 23-CV-260-JPS |

## 1. INTRODUCTION

Plaintiffs in this consolidated matter[1] allege that Defendant Advocate Aurora Health, Inc. ("Defendant") disclosed their personally

---

[1] The Second Amended Complaint names ten individuals as Plaintiffs: Shyanne John, Richard Webster, Deanna Danger, James Gabriel, Katrina Jones, Derrick Harris, Amber Smith, Bonnie LaPorta, Alistair Stewart, and Angel Ajani. ECF No. 27 at 1. Angelica Hudy was originally a named Plaintiff but is not named in the operative complaint. The Court later appointed these ten individuals as class representatives. ECF No. 36 at 6–7.

The Court mistakenly included Ms. Hudy in the case caption in its previous order, ECF No. 36, but corrects the error in the caption here and will direct the Clerk of Court to terminate Ms. Hudy from the docket. Likewise, the Court updates the caption in the lead case to reflect the addition of other named Plaintiffs. Finally, the Court will direct the Clerk of Court to correct the spelling of Ms. LaPorta's surname on the docket.

Case 2:22-cv-01253-JPS   Filed 07/10/24   Page 2 of 52   Document 54

identifiable information and protected health information without their consent to third parties such as Meta/Facebook and Google through tracking pixels that were installed on Defendant's public websites, mobile app, and patient portal. *See generally* ECF No. 27 (second amended complaint). The parties arrived at a mediated settlement, and in August 2023, the Court preliminarily approved their class-action settlement agreement. ECF Nos. 29, 36.

Now before the Court are Plaintiffs' motion for final approval of the class-action settlement, as well as their motion for attorneys' fees, expenses, and class representative service awards (as later modified by the final approval motion with respect to the fee request). ECF Nos. 38, 46. Defendant does not oppose either motion. However, a class member, through counsel, objected and took issue primarily with the amount of attorneys' fees class counsel seeks; further submissions from Plaintiff and the objector followed. ECF Nos. 42, 48, 51–53. Upon consideration of all these materials, the Court will grant final approval of the settlement agreement, certify the class, and grant in part Plaintiffs' motion for attorneys' fees, expenses, and class representative service awards.

## 2. BACKGROUND

The Court conditionally certified a class of over 2.5 million individuals and preliminarily approved a $12,225,000 common fund class

---

This consolidated case comprises five individual actions. *See* ECF No. 24 at 1–2. A sixth action was filed in the Eastern District of Wisconsin but voluntarily dismissed shortly thereafter. *Id.* at 2 n.1 (citing *Harris et al. v. Advocate Aurora Health, Inc.*, Case No. 22-CV-1515-LA (E.D. Wis. 2022)). Though that case was not formally consolidated into this matter, it is related: three of the four plaintiffs in Case No. 22-CV-1515 are named Plaintiffs here.

Case 2:22-cv-01253-JPS   Filed 07/10/24   Page 3 of 52   Document 54

settlement. ECF No. 36. The class was preliminarily defined as individuals who

> resid[e] in the United States whose Personal Information or health information was or may have been disclosed to a third party without authorization or consent through any Tracking Pixel on Defendant's websites, LiveWell App, or MyChart patient portal between October 24, 2017 and October 22, 2022. Excluded from the Class are Defendant and its affiliates, parents, subsidiaries, officers, and directors, as well as the judges presiding over this matter and the clerks of said judges. This exclusion does not apply to those employees of Defendant and its Related Parties who received Defendant's October 22, 2022 notification regarding its usage of Tracking Pixels.

*Id.* at 3.

Under the settlement agreement, class members with valid claims will receive payments of up to $50 from whatever amount remains in the common fund after attorneys' fees, litigation expenses, settlement administrator fees, taxes, and service awards are deducted. *Id.* at 3; ECF No. 47 at 13 (brief in support of motion for final settlement approval); ECF No. 35-2 at 21 (settlement agreement). In preliminarily approving the settlement agreement, the Court acknowledged that, under the agreement, Plaintiffs could seek an award of attorneys' fees of "up to 35% of the common fund." ECF No. 36 at 3.

A settlement administrator—Kroll Settlement Administration, LLC ("Kroll")—was appointed and administered notices to class members. ECF No. 47 at 13. Notice of the proposed class settlement reached 98.18% of class members via direct mail through a postcard notice with a portion that could be torn off and mailed in to file a claim or opt out. *Id.* (citing ECF No. 47-4 at 4–6); *id.* at 20; ECF No. 35-2 at 50–63. Kroll also sent the notice via email

to class members with valid email addresses. ECF No. 47 at 13. Kroll maintained a settlement website that included a form to file a claim online and also had settlement information and litigation documents posted. *Id.* at 14. Finally, a toll-free phone number was available for class members to call with questions. *Id.* at 20; ECF No. 47-3 at 4.

Class members submitted 570,963 claims, of which 565,543 Kroll ultimately validated—a claim rate of over 22% of the class. ECF No. 47 at 14 (providing original figure of validated claims); ECF No. 51-1 at 2 (declaration of class counsel attached to supplemental brief in support of final approval, providing updated figure of validated claims); ECF No. 50 at 19 (fairness hearing transcript). Due to the high claim rate, Kroll's administration costs are now approximately $2.75 million. ECF No. 47 at 14 (citing ECF No. 47-3 at 7 (Kroll declaration); ECF No. 47-3 at 7 ("[A]ssuming no changes in scope of work or additional administrative work needed beyond issuance of payments, total [administration] [c]osts will be $2,750,000.00.").

In November 2023, Plaintiffs submitted their motion for attorneys' fees, expenses, and class representative service awards. ECF No. 38. Specifically, they sought:

- $4,278,750 in attorneys' fees (35% of the gross common fund);
- $23,356.02 in litigation expenses; and
- $3,500.00 service awards for each of the ten class representatives.

*Id.* at 1. Plaintiffs' request for litigation expenses and service awards remains unchanged, but they have now reduced their attorneys' fees request to $3,250,000. ECF No. 47 at 15. This amount is 34.5% of the *net* amount left in settlement fund after Kroll's fees, expenses, and service awards are deducted (for purposes of this Order, the "net settlement

fund"); it is about 26% of the gross (that is, $12.225 million) common settlement fund. *Id.*; see also *infra* Section 3.4.1.1 (noting that net settlement amount is $9,416,643.98 and discussing correct method of calculating proposed fee as a percentage thereof).

Defendant did not submit any opposition to the motion for final approval of the settlement agreement, nor to the motion for attorneys' fees, litigation expenses, and service awards.

Seventy-one class members opted out of the settlement. *Id.* at 14. Five class members submitted timely objections to the proposed settlement agreement. ECF Nos. 40 (objection of Mary Boryu ("Boryu")), 42 (objection of Theodore Wynnychenko ("Wynnychenko")), 45 (objections of Stanley Guokas ("Guokas"), Christine Gleason ("Gleason"), and Tyler Dorner ("Dorner")). Boryu, Gleason, and Dorner all object to the settlement because they believe the settlement payments of up to $50 are too low; Guokas objects "based on the need for Aurora to continue to supply a necessary function to the community." ECF No. 40 at 2; ECF No. 45-2 at 2; ECF No. 45-3 at 2; ECF No. 45-1 at 2.[2] The most substantial objection, Wynnychenko's, primarily takes issue with the proposed award of attorneys' fees, but also raises concerns about the notice and objection processes, the $50 individual claim cap, and how the *cy pres* provision in the settlement will function if triggered. *See generally* ECF No. 42; *see also* Fed. R. Civ. P. 23(h) (authorizing class members to object to class counsel's fee

---

[2]Gleason also recounts an incident in which a provider at one of Defendant's clinics seemingly accessed a photo of her that was only on Gleason's phone. *See generally* ECF No. 45-2. While certainly an issue of privacy, that incident does not appear to relate to the allegations in this lawsuit.

motions). The exclusions and objections represent 0.003% of all class members. ECF No. 47 at 14.

Two days before the fairness hearing, Wynnychenko, through counsel, filed an amended version of Plaintiffs' proposed order for final approval of the settlement and disposition of this case. ECF No. 48 (amending ECF No. 44-1). This filing suggested "modest revisions to the proposed order . . . in the spirit of compromise" and in light of Plaintiffs' voluntary reduction of their attorneys' fees request. ECF No. 48-1 at 1, 3. Wynnychenko's proposed revisions appeared to concede that Plaintiffs' $3.25 million attorneys' fee request was reasonable, that the notice to class members and the objection and exclusion process was proper, and that his objection to the $50 individual claim cap was mooted due to the number of claims received. *See* ECF No. 48-3 at 5–6. Indeed, he wrote that his alternative proposed disposition order "would substantially overrule [his] objection" but simultaneously noted that he "st[ood] by his objection." ECF No. 48-1 at 1. Wynnychenko stated that the portion of his objection related to the distribution of residual settlement funds to "unnamed *cy pres* recipients . . . remain[ed] a live concern," *id.* at 2, but he acknowledged that if he and other class members were allowed a period to respond to any potential *cy pres* distribution before it is made, that portion of his objection would be mooted. ECF No. 48-3 at 6, 9.

The Court held a fairness hearing in March 2024. ECF No. 49. Wynnychenko appeared through counsel. *Id.* at 1. The Court overruled the Guokas objection as irrelevant and the Boryu, Gleason, and Dorner objections as properly remedied by opting out of the class. *Id.*; ECF No. 50 at 7. Plaintiffs confirmed that they were amenable to Wynnychenko's request for an opportunity to comment on prospective recipient(s) of *cy pres*

distributions and accordingly Wynnychenko withdrew that part of his objection. ECF No. 50 at 9, 14.

However, Wynnychenko's objection prompted further discussion on the matter of attorneys' fees, which the Court left unresolved. *Id.* at 7–18. In order to fulfill its "independent obligation to consider the matter of attorneys' fees," the Court directed Plaintiffs to submit detailed billing records. *Id.* at 11, 14; *see also id.* at 13 ("I appreciate the fact [that] with the significant reduction in the attorneys' fees, many of the[] other components of the overall objection probably have gone by the wayside. But . . . they're still viable because until I have the benefit of that sort of information [i.e., detailed billing records], I'm not sure" what is a reasonable award of attorneys' fees.).

Plaintiffs subsequently did so, submitting redacted billing records on the docket, ECF No. 51-1 at 4–64, and unredacted records directly to the Court for *in camera* review. They also submitted a supplemental brief in support of their fee request, addressing questions and comments the Court raised at the fairness hearing and urging the Court to find that their proposed fee award is reasonable (and to overrule Wynnychenko's objection in light of his alternative proposed order). ECF No. 51. Wynnychenko filed a supplemental objection, taking issue with Plaintiffs' "over-redact[ion]" of their billing records, and suggesting that the Court award a fee of $2,200,500 or 18% of the settlement fund, but noting that the Court has discretion to go above or below this number depending on its review of the billing records. ECF No. 52 at 2. Plaintiffs addressed these arguments in a reply brief. ECF No. 53.

### 3.    LAW AND ANALYSIS

The Court may approve a class action settlement if: (1) it is able to certify the settlement class; (2) the class was provided adequate notice and a public hearing; and (3) it determines that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1)–(2). The Court analyzes each point in turn, examining the matter of attorneys' fees both as part of the fairness of the settlement—given that Wynnychenko framed his objection to the settlement overall—but also as a standalone matter.

### 3.1    Rule 23(a) and (b) Factors – Settlement Class Certification

"A plaintiff seeking class certification has the burden to show that their proposed class meets the requirements of Rule 23(a) and the requirements for one of the three types of classes identified in Rule 23(b)." *In re TikTok, Inc., Consumer Priv. Litig.*, 617 F. Supp. 3d 904, 922 (N.D. Ill. 2022), *appeal dismissed sub nom. In re Tiktok Inc., Consumer Priv. Litig.*, No. 22-2682, 2022 WL 19079999 (7th Cir. Oct. 12, 2022) (citing *Dancel v. Groupon, Inc.*, 949 F.3d 999, 1004 (7th Cir. 2019)).

Rule 23(a) requires a plaintiff to show that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

Plaintiffs seek certification as a Rule 23(b)(3) class and therefore must show that "the questions of law or fact common to the class members predominate over any questions affecting only individual members," and

that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).[3]

Plaintiffs argue that the settlement class satisfies all of these requirements. ECF No. 47 at 16–19. Defendant, as noted above, does not oppose final approval of the class settlement, including certification of the settlement class. None of the objectors, including Wynnychenko, challenge certification of the settlement class. The Court has no independent basis to question whether final certification of the class as previously defined or appointment of Plaintiffs as class representatives, ECF No. 36 at 3 and 6–7, is appropriate. Accordingly, the Court does not disturb its earlier finding that the settlement class in this matter meets the requirements of Rule 23(a) and (b) and that Plaintiffs are appropriate class representatives. The Court will therefore certify the settlement class in this matter.

### 3.2 Rule 23's Notice Requirement

Class settlement approval requires the Court to find that the notice of settlement given to class members constituted "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *see also id.* at 23(e)(1) (requiring "notice in a reasonable manner to all class members"). "Neither Rule 23 nor due process requires that every class member actually receives notice. Instead, 'notice suffices if it is reasonably calculated to reach the absent parties.'" *In re TikTok*, 617 F. Supp. 3d at 927 (citing 3 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS

---

[3]The Court need not consider whether the case would be manageable as a class action, as referenced in Rule 23(b)(3)(D), because that inquiry is unnecessary to certify a settlement-only class. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

Case 2:22-cv-01253-JPS   Filed 07/10/24   Page 10 of 52   Document 54

§ 8:36 (5th ed. 2011) (updated 2021)). "According to the Federal Judicial Center, notice to at least seventy percent of the class generally meets this standard." *Id.* at 927–28 (citing FED. JUD. CTR., JUDGES' CLASS ACTION NOTICE AND CLAIMS PROCESS CHECKLIST AND PLAIN LANGUAGE GUIDE 3 (2010), https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf (last accessed July 10, 2024)).

Plaintiffs argue that they have met this requirement. First, they argue that the format of the postcard notice that was mailed to class members was calculated to, and did, "boost the amount of claims submitted." ECF No. 47 at 20. They emphasize that the reach of the postcard notice (to 98.18% of class members) meets and exceeds the general rule that notice should reach 70% to 95% of class members to satisfy the requirements of Rule 23(c)(2)(B) and Due Process. *Id.* (citing *Shy v. Navistar Int'l Corp.*, No. 3:92-CV-00333, 2022 WL 2125574, at *5 (S.D. Ohio June 13, 2022) and JUDGES' CLASS ACTION NOTICE AND CLAIMS PROCESS CHECKLIST AND PLAIN LANGUAGE GUIDE 3). Finally, they point to the availability of information on the settlement website and via a toll-free telephone number as further demonstrating that class members had ample notice of all relevant terms of the settlement and/or the opportunity to find out more about it. *Id.* at 21.

Wynnychenko does not disagree that the reach rate of the notices to class members was satisfactory. Rather, he takes issue with the "settlement, notice, and objection process" as "burden[ing] class members' rights of objection by depriving them of necessary information and imposing extraneous requirements on [them]." ECF No. 42 at 20. He is concerned that class members lacked adequate notice of class counsel's fee request because class counsel did not file their lodestar information and billing records alongside their motion for attorneys' fees, and posted only the fee *motion*,

but not its supporting brief explaining the grounds for their fee request, on the settlement website. *Id.* at 20–21.[4] Likewise, he argues that class counsel's failure to disclose the identities of the prospective *cy pres* recipients burdened class members' ability to object to residual fund distributions to organizations which may be inappropriate or causes with which they may disagree. *Id.* at 21–22.

As a preliminary matter, Wynnychenko's amended proposed order concedes that the nondisclosure of prospective *cy pres* recipients will in all likelihood be a non-issue because (1) the *cy pres* provision is unlikely to be triggered and (2) if it is, he and class members should be able to submit their opinions on the intended recipients. ECF No. 48-3 at 6, 9. If any doubt remained as to his position, Wynnychenko explicitly withdrew this portion of his objection at the fairness hearing after Plaintiffs agreed to permit a response period on any proposed *cy pres* distribution. ECF No. 50 at 14. In light of these occurrences, and because the Court has no independent basis to question whether notice to class members was sufficient with respect to the term of the settlement agreement authorizing a potential *cy pres* distribution, the Court need not pursue this issue further. Wynnychenko's objection is overruled in this regard.

Similarly, Wynnychenko now appears to concede that the notice to class members of class counsel's fee request was sufficient—his suggested revisions to class counsel's proposed settlement approval order make no changes to class counsel's recommended finding that they "properly

---

[4]Wynnychenko's concerns that the objection and exclusion process itself is unduly burdensome (as opposed to his concerns about the sufficiency of the notice to class members with respect to that process) are addressed *infra* Section 3.3 as part of the fairness analysis. His objection to the proposed award of attorneys' fees is addressed *infra* Section 3.4.

Case 2:22-cv-01253-JPS   Filed 07/10/24   Page 12 of 52   Document 54

notified the [c]lass of the maximum fee request." ECF No. 48-3 at 5. Wynnychenko has not pursued this line of argumentation in any of his further briefing but he has also not affirmatively withdrawn it. Addressing this argument for the sake of complete analysis, the Court finds that notice of the fee request was satisfactory. "In a certified class action, the court may award reasonable attorney's fees . . . [if] [n]otice of the *motion* [is] . . . directed to class members in a reasonable manner." Fed. R. Civ. P. 23(h)(1) (emphasis added). Plaintiffs provided notice of the fee motion to class members by posting the motion—which disclosed the original total amounts of attorneys' fees (now reduced), expenses, and service awards sought, ECF No. 38—on the settlement website. They did what the language of Rule 23(h) requires.

Wynnychenko has adduced no authority conclusively supporting his assertion that Rule 23(h) or any other authority requires that the brief in support of the motion and/or billing records be made available to class members at the time the fee motion is filed. The Seventh Circuit case he cites, ECF No. 42 at 20–21, states that it was a "violat[ion]" of Rule 23(h) for class counsel not to have "file[d] the attorneys' fee motion until after the deadline . . . for objections to the settlement had expired." *Redman v. RadioShack Corp.*, 768 F.3d 622, 637–38 (7th Cir. 2014) (citing *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 993–95 (9th Cir. 2010) and Advisory Committee Notes on the 2003 Amendments to Fed. R. Civ. P. 23(h)). While Wynnychenko's citation to *Redman* is thoughtful, he overextends the case. The passage is arguably dicta, and, moreover, the Court reads it as being less about the contents of fee motions and more about the timing of fee motion disclosures relative to the objections period. *See id.* at 638 ("[Objectors] were handicapped in objecting because the details of class

Page 13 of 52

counsel's hours . . . were submitted *later*, . . . [and] by not knowing the rationale that would be offered for the fee request . . . ." (emphasis added)). Nothing in this passage nor in Rule 23 requires that class counsel's billing records be disclosed to the class alongside the fee petition. *See* Advisory Committee Notes on the 2003 Amendments to Fed. R. Civ. P. 23(h) (stating that the court should "require the filing of at least the initial motion in time for inclusion of information about the motion in the notice to the class about the proposed settlement that is required by Rule 23(e)").

Wynnychenko's reliance on a recent class settlement approval by Judge Lynn Adelman is even more questionable. ECF No. 42 at 21 (citing *In re Forefront Data Breach Litig.*, No. 21-CV-887, 2023 WL 6215366, at *6–7 (E.D. Wis. Mar. 22, 2023)). He states that class counsel in that case, one of whom is the same attorney representing the Plaintiffs in this case, "kn[e]w that they ought to include the fee papers [on the settlement website], because they've done it before." *Id.* But Judge Adelman did not find that all fee motion papers were required to be disclosed to class members or fault the plaintiffs for not having done so; he did not cite the above-quoted passage in *Redman*; he did not even remotely address the issue for which Wynnychenko cites his order, but rather he addressed whether a "message" directly to class members about the fee motion was required. *In re Forefront Data Breach Litig.*, 2023 WL 6215366, at *7. A party's behavior in previous litigation—even if that behavior could be considered best practice[5]—does not amount to a rule of law and does not bind this Court.

_____

[5]The Court notes parenthetically that making billing records available to it and to class members at the time the fee motion is filed might help facilitate a more prompt and complete appraisal of the reasonableness and fairness of the settlement, whereas—at least as seen in this case—obscuring this information can necessitate supplemental submissions and lead to delays in final disposition.

For all these reasons, Wynnychenko's objection is overruled to the extent that he argues that the notice of the settlement to class members was insufficient to satisfy the requirements of Rule 23(c)(2)(B). Moreover, the Court finds that class members in this action received "the best notice [of the settlement] that [was] practicable under the circumstances, including individual notice to all members who [could] be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).

### 3.3    Rule 23(e)'s Fairness Analysis

"Federal Rule of Civil Procedure 23(e) requires court approval of any settlement that effects the dismissal of a class action. Before such a settlement may be approved, the district court must determine that a class action settlement is fair, adequate, and reasonable, and not a product of collusion." *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 279 (7th Cir. 2002) (quoting *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000)). Relevant factors for determining that the settlement is fair include "(1) the strength of the case for plaintiffs on the merits, balanced against the extent of [the] settlement offer; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to the settlement; (4) the reaction of members of the class to the settlement; (5) the opinion of competent counsel; and (6) [the] stage of the proceedings and the amount of discovery completed." *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863 (7th Cir. 2014) (quoting *Gautreaux v. Pierce*, 690 F.2d 616, 631 (7th Cir. 1982)); *see also* Fed.

---

Indeed, some district courts require that lodestar information be included in any motion for attorneys' fees even if the moving party will seek a percentage-of-the-fund award. *See, e.g., Linman v. Marten Transp. Ltd.*, No. 22-CV-204-JDP, 2024 WL 2974831, at *4 (W.D. Wis. June 13, 2024).

R. Civ. P. 23(e)(2) (listing factors).[6] The Court considers the facts "in the light most favorable to the settlement" and focuses not on "individual components of the settlement[]," but rather views the settlement "in [its] entirety in evaluating [its] fairness." *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996) (quoting *Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 315 (7th Cir. 1980), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998)).

All factors weigh in favor of approval of the settlement in this case. As to the first, second, and sixth factors, the settlement sufficiently reflects the merits and value of Plaintiffs' claims and the likely complexity, length, and expense of further litigation balanced against the stage of litigation reached and the work actually performed. As discussed in more detail with respect to the motion for attorneys' fees, *infra* Section 3.4, this case presented substantial risk of either an uphill battle or no recovery at all for Plaintiffs and their counsel, because similar cases had been dismissed at the pleading stage around the time that this case was filed. The $12+ million non-reversionary common fund recovery achieved is significant relative to that risk and suggests that Plaintiffs' case has merit.

Wynnychenko argues that Plaintiffs overstate both the riskiness of this case and the value of the results they achieved for the class, since the

---

[6]Congress amended Rule 23 in 2018 to enumerate the concerns that courts should consider when deciding whether to approve a class action settlement: the adequacy of class counsel's and the class representatives' representation of the class; whether the proposal was negotiated at arm's length; the adequacy of relief that the settlement provides to the class; and whether the proposal treats class members equitably. Advisory Committee Notes on the 2018 Amendments to Fed. R. Civ. P. 23(e)(2); Fed. R. Civ. P. 23(e)(2)(A)–(D). However, Congress stated that these factors were not intended to "displace" any of the tests devised by the courts of appeals. Advisory Committee Notes on the 2018 Amendments to Fed. R. Civ. P. 23(e)(2).

settlement "extinguishes claims that . . . may be worth $100 or $1,000 under various statutory damages provisions" while providing a comparatively modest payout to class members. ECF No. 42 at 8; *id.* at 19–20. He also objects that the requested fee award is disproportionate considering the early stage at which this case settled, and that larger fees should be reserved for cases which have progressed into more complex stages of litigation and in which the attorneys have expended more time and effort. *Id.* at 13–14. However, since Wynnychenko is primarily raising these arguments in opposition to the proposed attorneys' fees, rather than in opposition to overall approval of the settlement, *see id.*, the Court addresses it as such in the following section. While Wynnychenko's argument provides fodder for modifying Plaintiffs' class counsel's fee request, the Court does not find that it weighs against overall approval of the settlement. If a class member believed that the value of their individual claim exceeds their likely payout under the settlement agreement, their remedy was to opt out of the settlement (which a number of class members did). Those who remain in the class will receive the benefit of a monetary payout with none of the inconveniences of litigation; on balance, irrespective of whether that payout is worth more or less than each individual class member's actual and/or statutory damages, the settlement recovery in this case reflects a fair compromise of those claims.

Both the third and fourth factors weigh in favor of approving the settlement as well. The amount of opposition to the settlement is minimal. As noted above, less than a hundredth of a percent of class members have objected to or opted out of the class, and moreover, well over one-fifth of the class has made a valid claim. The low level of opposition and the high level of participation reflects that class members are overall satisfied with

the terms of the settlement agreement. And the reactions of those class members who filed objections do not preclude settlement approval. The Court already overruled four of five objections as meritless, and in this Order, it finds most of Wynnychenko's objection similarly unpersuasive.[7] As detailed below, the Court finds Wynnychenko's objection persuasive to the extent that he believes that Plaintiffs' class counsel's fee request is

---

[7]Wynnychenko's objection regarding the $50 claim cap is mooted because the high claim rate in this case means that class members' payouts will not reach this cap. *See* ECF No. 48-3 at 6. As already noted, he formally withdrew his objection to the *cy pres* provision. ECF No. 50 at 9, 14.

The only remaining portion of Wynnychenko's objection that is not either withdrawn or addressed elsewhere in this Order criticizes the settlement's objection and exclusion process as "unreasonably burden[ing] class members' rights of objection by depriving them of necessary information and imposing extraneous requirements" on them. ECF No. 42 at 20. He criticizes the opt-out process as "affirmatively hinder[ing] the process of objection and exclusion" because (1) it is not available online and must be done by snail mail (the only online option that class members can take is to file a claim); (2) requires that objections and opt-out forms be mailed to multiple entities (the Court, Kroll, and counsel); and (3) requires that objecting and opting-out members provide information that he deems irrelevant. *Id.* at 22–25.

Wynnychenko's alternative proposed order appears to forfeit this argument. ECF No. 48-3 at 5 (no changes to class counsel's recommended disposition that "[t]he objection and exclusion process met due process"). He did not mention the objection/exclusion process during the fairness hearing or in his supplemental objection. Although this portion of the objection seems to be off the table, for the sake of complete analysis, the Court finds it unpersuasive. First, it is entirely speculative: the Court agrees with Plaintiffs that "[t]here is simply no evidence suggesting anyone was deterred from objecting or seeking exclusion." ECF No. 47 at 41 (citing *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 970 (N.D. Il. 2011)). Moreover, there is nothing out of the ordinary about the objection and exclusion process employed (with the Court's blessing) here, and indeed it seems to have facilitated an orderly claims process. *See In re Equifax Inc. Cust. Data Sec. Breach Litig.*, 999 F.3d 1247, 1265–66 (11th Cir. 2021) (finding that objection/exclusion process with similar requirements "was not particularly burdensome").

Case 2:22-cv-01253-JPS   Filed 07/10/24   Page 18 of 52   Document 54

excessive. But that issue is best addressed by reducing the fee award, not by rejecting the settlement.

Finally, the Court accords weight to the opinion of class counsel that the settlement agreement is fair, reasonable, and adequate. *Gautreaux*, 690 F.2d at 634 (quoting *Armstrong*, 616 F.2d at 315). The attorneys appointed as lead class counsel, ECF Nos. 15 and 24, are experienced in class-action litigation in general and in consumer data privacy actions in particular. ECF No. 47 at 47–48. The Court trusts their judgment that the settlement they have negotiated on the class's behalf is a fair outcome.

In sum, the Court finds that the settlement agreement was negotiated at arm's length, in good faith and without collusion, by capable and experienced counsel, with full knowledge of the facts, the law, and the risks inherent in litigating, and with the active involvement of the parties and a mediator. The settlement agreement confers substantial benefits on the class members, is not contrary to the public interest, and will provide the parties with repose from litigation. The parties faced significant risks, expense, and/or uncertainty from continued litigation of this matter, which further supports the Court's conclusion. Based on all of these factors, the Court sees no barrier to final approval of the class settlement in this matter, and accordingly will grant Plaintiffs' motion seeking the same, ECF No. 46.

### 3.4 Motion for Attorneys' Fees, Expenses, and Service Awards

For the reasons and on the terms stated below, the Court finds it appropriate to reduce Plaintiffs' class counsel's fee request, and therefore will sustain in part Wynnychenko's objection. Accordingly, the Court grants, as stated herein, Plaintiffs' motion for attorneys' fees, expenses, and service awards. It will award attorneys' fees to class counsel in the amount of $2,824,993.19 or 30% of the net settlement fund, together with litigation

costs in the amount of $23,356.02 and service awards of $3,500.00 to each of the ten named Plaintiffs in the aggregate amount of $35,000.00.

### 3.4.1 Attorneys' Fees

The Court may award reasonable attorneys' fees "that are authorized by . . . the parties' agreement." Fed. R. Civ. P. 23(h). "But in doing so, courts must be aware of the potential conflict of interest between class counsel and the class that arises when class counsel asks for fees to be paid out of a common fund, because every dollar the attorneys receive is a dollar that the class does not." *In re TikTok*, 617 F. Supp. 3d at 939 (citing *Redman*, 768 F.3d at 629, 633). Accordingly, evaluating the reasonableness of a fee request requires the Court to "compare attorney fees to what is actually recovered by the class." *In re Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.*, 867 F.3d 791, 793 (7th Cir. 2017) (citing *Pearson v. NBTY, Inc.*, 772 F.3d 778, 782 (7th Cir. 2014)). The Court's aim is "to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Camp Drug Store, Inc. v. Cochran Wholesale Pharm., Inc.*, 897 F.3d 825, 832–33 (7th Cir. 2018) (quoting *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007)). Other relevant factors for the Court to consider include "the quality of the attorney[s'] performance, the amount of work necessary to resolve the litigation, and the stakes of the case." *Id.* at 833 (citation omitted).

"Because the market-price estimation is 'inherently conjectural,' district courts have discretion to use either the percentage method, which awards fees as a percentage of the common fund, or the 'lodestar' method, which awards fees based on the attorneys' hours and billing rates, to assess the reasonableness of a fee request." *In re TikTok*, 617 F. Supp. 3d at 939 (quoting *Douglas v. W. Union Co.*, 328 F.R.D. 204, 220 (N.D. Ill. 2018), and 5

RUBENSTEIN § 15:63). "Courts frequently use the percentage method in the first instance and cross-check the amount using the lodestar method." *Id.* (citing *Williams v. Rohm and Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011), and 5 RUBENSTEIN § 15:88). This is "a means of ensuring that the percentage award is not a windfall" to the attorneys. 5 RUBENSTEIN § 15:88 (footnote omitted). "[T]he district court has an independent obligation to scrutinize the legitimacy of" fee requests. *Spellan v. Bd. of Educ. for Dist. 111*, 59 F.3d 642, 646 (7th Cir. 1995) (citing *Hutchinson v. Amateur Elec. Supply, Inc.*, 42 F.3d 1037, 1048 (7th Cir. 1994)); *see also Cook v. Niedert*, 142 F.3d 1004, 1011 (7th Cir. 1998) (noting the court's role as a "fiduciary for the fund's beneficiaries" and quoting *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 253 (7th Cir. 1988)).

As explained below, the Court finds it appropriate to reduce the percentage fee to 30% of the net settlement fund. Wynnychenko's objection to the proposed award of attorneys' fees is sustained.

### 3.4.1.1 Fee Request Amount

The Court first clarifies the amount of Plaintiffs' fee request and how it is most accurately described. They originally sought $4,278,750 in attorneys' fees, or 35% of the gross (that is, $12.225 million) common settlement fund. ECF No. 38 at 1. They subsequently revised this request to $3,250,000, which is 34.5% of the net settlement fund after Kroll's fees, expenses, and service awards are deducted ($9,416,643.98). ECF No. 47 at 15.

Plaintiffs repeatedly present their revised request as "26% of the [s]ettlement [f]und," and emphasize that such a percentage is "below the range typically approved by courts within the Seventh Circuit and [therefore] reasonable." ECF No. 47 at 29.

Plaintiffs' class counsel's math here isn't wrong, but the correct way to describe their fee request is as **34.5%** of the net settlement fund. As Wynnychenko points out, analyzing the fee request as a percentage of the entire or gross common settlement fund is improper. ECF No. 42 at 12–13; ECF No. 52 at 1; *In re TikTok*, 617 F. Supp. 3d at 939 ("[T]he gross value of the fund is not the proper denominator."); *In re Sears*, 867 F.3d at 793. The proper formula to calculate the fee request for purposes of the reasonableness analysis is as a percentage of the gross or total common settlement fund *less* administration and notice expenses and litigation costs.[8] *See Pearson*, 772 F.3d at 781–82; *Redman*, 768 F.3d at 630 ("The ratio that is relevant to assessing the reasonableness of the attorneys' fee . . . is the ratio of (1) the fee to (2) the fee plus what the class members received."); *In re Cap. One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 795 (N.D. Ill. 2015) ("Administration and notice costs, although paid through the settlement fund, are not benefits to the class and thus not part of 'what the class members received.'" (quoting *Redman*, 768 F.3d at 630); *id.* ("[C]osts incurred as a part of the settlement do not shed light on the fairness of the split between Class Counsel and class members." (citing *Pearson*, 772 F.3d

---

[8]Plaintiffs also deduct class representative awards from their net settlement fund amount to arrive at the 34.5% figure. ECF No. 47 at 31 (classifying service awards among "administrative expenses"). As a practical matter, it is true that any money that goes to the class representatives is money that cannot go to the attorneys. But deducting these service awards to arrive at the net settlement amount is not required under the law, as far as the Court is aware—the class representatives are members of the class, so logic dictates that payments to them can be considered part of the value that the class receives. Ultimately, though, this is small potatoes: any increase to the net settlement amount by including the service award as part of the value that the class receives ($9,451,643.98) results in only a negligible difference in the percentage-fee request (which would come out to 34.3% instead of Plaintiffs' requested 34.5%).

at 781)). Therefore, Plaintiffs' 26% figure is irrelevant, and for the balance of this Order the Court will use the 34.5% figure to describe the amount of Plaintiffs' percentage-fee request.[9]

### 3.4.1.2 Wynnychenko's and Plaintiffs' Arguments

The Court below summarizes Plaintiffs' and Wynnychenko's arguments in support of their respective positions. Although perhaps tedious, reciting each player's positions will ensure that all arguments are adequately addressed in the sections that follow.

Plaintiffs advance several arguments in support of their 34.5%[10] request. First, they argue that a contingency fee is the market rate in class action cases like theirs, and that awarding attorneys' fees as a percentage of the common fund—rather than performing a lodestar analysis to determine the fee award based on attorney hours expended—best replicates the market for contingency-fee representation. ECF No. 39 at 10–11 (stating that class counsel was "retained on a contingency fee basis and, as a result, the market rate for this case is a contingency fee"). They note that district courts have discretion to choose between the percentage and lodestar methods in

---

[9]Although Plaintiffs emphasize that either percentage would be reasonable, ECF No. 47 at 30–31 (collecting cases and noting amounts of fees awarded as a percentage "of the entire settlement fund" versus "of the net settlement fund"), they acknowledge the Seventh Circuit's instruction that fees be calculated as a portion "of the total amount of money going to class members and their counsel.'" *Id.* at 30 (quoting *Leung v. XPO Logistics, Inc.*, 326 F.R.D. 185, 202 (N.D. Ill. 2018)). In other words, Plaintiffs seem to admit that they have known all along the correct formula for assessing fee requests relative to common fund settlements. And yet they press their 26% figure, which in the Court's view, only serves to obfuscate the true character of Plaintiffs' class counsel's fee request.

[10]For the reasons just explained, the Court will consistently use 34.5% to describe the amount of Plaintiffs' fee request, although Plaintiffs and Wynnychenko use different numbers in their briefing.

determining the market rate and argue that a lodestar cross-check of any percentage amount is not required in this case. *See id.* at 11 & n.1 (collecting cases). They therefore decline to provide any lodestar calculation in their original fee petition brief. Class counsel does aver, however, that they "took steps to remove the potential for duplication of work on behalf of Plaintiffs' counsel." ECF No. 39-1 at 5.

Plaintiffs' class counsel further contend that consideration of "the results [they] obtained" for the class, "the complexity, length, and expense of the litigation," "the stakes of the case," class counsel's assumption of the risk of nonpayment, class counsel's skill and experience, and the "time and labor required" for this case all militate in favor of a percentage-fee award of 34.5% of the net settlement fund, which is in line with those percentage awards typically granted in class action cases. ECF No. 39 at 11–20 (capitalization omitted). They emphasize that the $12.225 million common fund settlement "is a strong recovery" that "compares favorably to other recent pixel cases" and that their fee request is comparable to those in similar data privacy cases. *Id.* at 13–14 (noting a per-person recovery of $4.89 in this 2.5 million-member action and comparing other pixel data privacy cases with per-person recoveries of $4.59, $4.89, and $6.10; also noting that fees were awarded in these cases at rates of 33.33% and 35% of the common funds). They contend that this case presented substantial risk and "immense uncertainty" to Plaintiffs and class counsel given the recent dismissal of similar cases at the pleadings stage. *Id.* at 14–15 (citing *Kurowski v. Rush Sys. for Health*, 659 F. Supp. 3d 931 (N.D. Ill. 2023), and *Hartley v. Univ. of Chi. Med. Ctr.*, No. 22 C 5891, 2023 WL 7386060 (N.D. Ill. Nov. 8, 2023)); *id.* at 17 (describing the case as "relatively novel"). Finally, class counsel acknowledges that the case was resolved within about a year and

without motion practice, but states that they have earned the full fee award that they seek by coordinating a number of cases, Plaintiffs, and attorneys across multiple jurisdictions, drafting "a comprehensive and detailed consolidated complaint," "conducting discovery for settlement purposes," and engaging in "detailed, protracted settlement negotiations" including two mediation sessions. *Id.* at 17–19.

Wynnychenko does not disagree with the general proposition that a contingent fee, calculated as a percentage of the common fund, can serve as the market rate in class actions, and he does not disagree that a percentage-fee structure would be appropriate here. He strongly disagrees, however, that a fee award as large as Plaintiffs request is appropriate here in light of the early resolution of this case. ECF No. 42 at 13. He argues that the market rate for a case like this one, where "class counsel did not litigate a single dispositive motion"[11] and settled the case early "before facing *any* risky hurdles," would be a much lower percentage than what Plaintiffs have suggested. *Id.* at 14, 15; *id.* (distinguishing cases that Plaintiffs cite). He recommends that "perhaps 10%" would be a reasonable fee, a figure he draws from two securities-related cases where impacted pension funds suggested capping attorneys' fees at a certain percentage if the cases settled before resolution of dispositive motions. *Id.* at 11 & n.3 (citing *Knurr v. Orbital ATK Inc. et al.*, No. 1:16-cv-01031-TSE-MSN, ECF No. 459-1 at 5 (E.D. Va. May 24, 2019) (objection of New York State Comptroller's Office to fee request, suggesting an 8% fee for settlement achieved prior to adjudication of motions to dismiss), and *In re RH, Inc. Sec. Litig.*, No. 4:17-cv-00554-YGR,

_____

[11]He also speculates that, given the early stage of the litigation, Plaintiffs likely did not conduct much discovery. *See* ECF No. 42 at 14–15.

ECF No. 145-1 at 4 (N.D. Cal. Sept. 17, 2019) (declaration of Chicago Teachers' Pension Fund suggesting a 15% fee for settlement achieved after a motion to dismiss but before adjudication of summary judgment).[12]

Wynnychenko further disagrees that a lodestar cross-check is not required in this case and argues that the Court should exercise its discretion to perform such a check of Plaintiffs' percentage-fee request. *Id.* at 15–19. Performing a lodestar cross-check, he argues, would allow the Court to ensure that any percentage-fee award is not an "unwarranted attorney windfall[]." *Id.* at 16 (citations omitted). He submits that the Seventh Circuit either "prescribes" or "suggest[s]" that percentage-fee requests exceeding two times the lodestar amount resulting from such a cross-check (the "2.0 lodestar multiplier") would be a windfall to class counsel and therefore unreasonable. *Id.* at 8, 16 (citations omitted). He argues that, from Plaintiffs' class counsel's acknowledgement that they "reviewed their hours" and endeavored to avoid duplicative work, but nonetheless failed to disclose their billing records, "the Court should draw an adverse inference that the hours are relatively sparse, which would be consistent with settling prior to substantive litigation." *Id.* at 15. Finally, he asserts that this case was not so risky as class counsel lets on, asserting that the various Plaintiffs' filing

---

[12]Wynnychenko neglects to mention that the court in *Knurr* disregarded the objection and awarded the lead class counsel their requested 28% fee. *Knurr v. Orbital ATK, Inc.,* No. 1-16-CV-01031-TSE-MSN, 2019 WL 3317976, at *1 (E.D. Va. June 7, 2019). On the other hand, the *RH* court adopted the Chicago teachers' suggestion. *In re RH, Inc. Sec. Litig.,* No. 4:17-00554-YGR, 2019 WL 5538215, at *5 (N.D. Cal. Oct. 25, 2019). But again, Wynnychenko neglects to mention that their 15% suggestion was in line with what the lead class counsel was requesting anyways. *In re RH, Inc. Sec. Litig.,* No. 4:17-cv-00554-YGR, ECF No. 145-1 at 4 ("Chicago Teachers believes that Lead Counsel's request for an award of attorneys' fees in the amount of 15% is fair and reasonable . . . .").

of "numerous overlapping Meta Pixel cases" belies their suggestion that this case was especially novel and risky such that a high percentage fee is warranted. *Id.* at 19–20.

Plaintiffs reply, in their final settlement approval motion, that all these arguments are unavailing and should not defeat final approval of the settlement and granting of their 34.5% fee request. ECF No. 47 at 29–39. They argue that this request is within the range of "customary contingency agreement[s] of 33% to 40% of the total recovery," which recognizes and compensates class counsel for assuming the risk of nonpayment, which they insist was high in this matter. *Id.* at 30–31 (collecting cases), 39 ("The fact that many cases had been *filed* is irrelevant; few cases had been settled or even had motions to dismiss decided."). They also argue that such a rate "falls squarely within the market rate established by other data privacy class actions," rejecting Wynnychenko's references to fee rates in securities litigation as immaterial. *Id.* at 33–34 (collecting cases).

Further, Plaintiffs maintain that no lodestar cross-check is necessary in this case, and reason that requiring such a check in every case could disincentivize efficient and early settlement by rewarding class counsel to drag out litigation in order to run up the meter on their own eventual fee request. *Id.* at 36–38. They also challenge the accuracy of Wynnychenko's assertion that the Seventh Circuit has established a 2.0 lodestar multiplier ceiling on percentage-fee awards, noting that "the Seventh Circuit has rejected any cap on a multiplier" and providing examples of courts approving multipliers of two to "higher than five." *Id.* at 32–33 (citing *Williams*, 658 F.3d at 636 and collecting other cases).

However, Plaintiffs submit that, if the Court opts to conduct a lodestar cross-check in this case, such an analysis would reveal that their

fee request is reasonable and in line with any purported 2.0 lodestar multiplier. *Id.* at 32 ("[T]he current lodestar multiplier is approximately 2.04, and will almost certainly be less than 2.0 when all the work of finalizing this [s]ettlement is concluded."); *id.* at 39, n.7 ("Class Counsel and Plaintiffs' Counsel have devoted 2075.50 hours prosecuting this matter . . . with a lodestar total of $1,590,114.55.")[13]; ECF No. 47-2 at 3 ("Class Counsel took steps to remove the potential for duplication for work on behalf of Plaintiffs' counsel.").

As detailed *supra* Section 2, Wynnychenko made an additional filing shortly before the fairness hearing that called into question the extent to which he maintained his objection to the proposed fee award. At the fairness hearing, the Court suggested that this case might be appropriate for application of a sliding-scale fee structure. ECF No. 50 at 11. Moreover, the Court directed Plaintiffs' counsel to submit their billing records, leaving to the parties and Wynnychenko the matter of appropriate redaction of those records. *Id.* at 14–16. Plaintiffs and Wynnychenko addressed this inquiry, and further briefed their positions and addressed the billing records, after the fairness hearing. ECF Nos. 51–53.

In supplemental briefing, Plaintiffs argue that a sliding-scale fee is not appropriate here because such a fee structure is intended to apply primarily to "megafund" cases where there is a higher risk of a "windfall" to counsel "based on the size of the fund" rather than results attained for the class. ECF No. 51 at 2 (citing and discussing *In re Synthroid Mktg. Litig.*, 325 F.3d 974 (7th Cir. 2003) ("*Synthroid II*")). Even if the Court replicated the

---

[13]Plaintiffs cite to the declaration of class counsel—not billing records—to substantiate these figures. ECF No. 47 at 39 n.7 (citing ECF No. 47-2 at 8).

sliding-scale structure employed in *Synthroid II*, where the Seventh Circuit awarded "30% of the first $10 million and 25% of the next $10 million," they argue, doing so would result in a higher fee award than what class counsel here has requested. *Id.* (quoting 325 F. 3d at 980).

Wynnychenko agrees that a sliding-scale fee methodology is not warranted here since this case does not implicate concerns of an outsized reward relative to time expended—"a $100 million settlement does not require ten times more effort than a $10 million settlement"—and that awarding a flat, instead of a declining, percentage fee in this case makes sense because doing so "encourage[s] attorneys to pursue comparatively smaller cases." ECF No. 52 at 3–4.

However, he continues to urge that class counsel's 34.5% flat-fee request is too much in light of the early settlement in this case. *Id.* at 5. He contends that authorizing flat-fee awards that increase based on whether the case has progressed past the pleadings and through discovery, motion practice, or trial properly "align[s] the incentives of class and counsel" by encouraging counsel to take actions that are likely to increase the settlement value of a case, rather than "tempt[ing]" counsel to accept early and lower-value settlements "if their fee is the same percentage either way." *Id.* at 7–8. He also asserts that a smaller fee "permits courts space to award higher percentages" to attorneys who perform more work and "bear[] extraordinary risk." *Id.* at 9.

Walking back his earlier argument for a 10% fee, Wynnychenko now settles on 23.8% of the net settlement fund—roughly $2.2 million—as an appropriate fee, balancing the early settlement against the "unexpectedly strong claim rate" and the attendant increased workload of administering the settlement to a larger number of claimants. *Id.* at 8–9. He continues to

base his suggested percentage on the pension funds' submissions in the securities cases he cited in his original objection. *Id.* at 5, 9. He posits that these cases are good "guideposts" because the fee requests therein are more closely negotiated and heavily scrutinized, and therefore a better reflection of the true market rate. *Id.* at 5–6 (noting that pension funds are "legally sophisticated and often possess securities holdings massive enough that the fee award makes a real difference to their recovery," whereas "[c]onsumer plaintiffs" like those here "almost always receive vastly more from their incentive awards than any marginal benefit from reducing attorneys' fees might award them," so lack incentive to scrutinize proposed fee awards). Plaintiffs do not really engage with these arguments beyond stating that "megafund securities actions" are simply different than consumer data privacy actions. ECF No. 53 at 3.

Returning to Plaintiffs' arguments, they state that class counsel's billing records demonstrate that their fee request—updated to a lodestar total of $1,700,586.24 for 2,210.49 hours of work—is reasonable from a lodestar perspective. ECF No. 51 at 1–2; ECF No. 51-1 at 3. They stress that Wynnychenko's submission of an alternative proposed order appears to have conceded as much. ECF No. 51 at 2–3. Finally, they submit the declaration of William B. Rubenstein, "one of the nation's foremost experts on fee awards," in support of their argument that a lodestar cross-check is not only unnecessary but might reward attorney inefficiency. *Id.* at 4–5 (citing ECF No. 51-1 at 65–130).

Wynnychenko takes class counsel to task for redacting all descriptions of their work in the billing records, noting that they have been more even-handed with privilege redactions in other litigation. ECF No. 52 at 3 (citing ECF Nos. 52-1 and 52-2 (redacted billing records for class counsel

in other class action matters)); *id.* at 9. From what Wynnychenko can see of the billing records, he speculates that "the timing of the billing suggests duplication," especially in the pre-consolidation and pre-mediation phases of the case, which class counsel should have omitted from their fee petition as redundant. *Id.* at 9–10 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)). To account for this potential duplication, Wynnychenko proposes "two rough estimates of a reasonable lodestar[,] discounting [the] duplication inevitably caused by engaging so many attorneys in filing six different complaints." *Id.* at 11–13. One estimate attempts to "discount[] for duplication" early in the case by adjusting the lodestar downwards at certain stages of the case, and the other "omit[s] the time worked by several of the redundant firms." *Id.* at 11, 12. Wynnychenko also questions whether Plaintiffs are seeking a reasonable hourly rate, pointing out that it appears that "senior attorneys perform[ed] nearly all of the work" and the billing records reveal a "blended hourly rate of $767/hour." *Id.* at 11 (citing *Alcon Vision, LLC v. Lens.Com, Inc.*, No. 18-cv-407 (NG) (SJB), 2023 WL 8072507, at *8 (E.D.N.Y. Nov. 21, 2023)).

Plaintiffs' response to these proposed lodestar modifications is essentially "no takebacks!": Plaintiffs emphasize that Wynnychenko seemingly conceded in his alternative proposed order that Plaintiffs' original fee request was reasonable and should not be allowed to reverse course now. ECF No. 53 at 4. They conclude by reiterating that they have earned the full fee requested in light of the novelty of this case and the risk that counsel assumed in litigating it, and that their request is "below the standard rate in the Seventh Circuit." *Id.* at 5.

### 3.4.1.3 Sliding-Scale Fee Structure

After parsing these arguments and reviewing relevant authority, the Court is persuaded that it is not necessary or appropriate to impose a sliding-scale fee structure in this case. The Court initially made this suggestion at the fairness hearing in the interest of striking a workable balance between Plaintiffs' and Wynnychenko's positions by following a method that the Seventh Circuit and courts herein have modeled. *See In re Stericycle Sec. Litig.*, 35 F.4th 555, 562 (7th Cir. 2022) ("We have recognized that sliding scale fee arrangements . . . are often the product of arms-length negotiations ex ante." (citing *Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 959 (7th Cir. 2013))); *see also Aranda v. Caribbean Cruise Line, Inc.*, No. 12 C 4069, 2017 WL 1369741, at *6–9 (N.D. Ill. Apr. 10, 2017) (determining that "a sliding-scale structure is appropriate" and "award[ing] class counsel 36% of the first $10 million ($3.6 million), 30% of the second $10 million ($3 million), 24% of the band from $20 million to $56 million ($8.64 million), and 18% of the remainder."), *aff'd sub nom. Birchmeier v. Caribbean Cruise Line, Inc.*, 896 F.3d 792 (7th Cir. 2018)).

Plaintiffs and Wynnychenko are correct that such a structure is more commonly applied in common fund settlements larger than the one at issue here. *See, e.g.*, *In re Stericycle*, 35 F.4th at 559–63 (applying sliding-scale fee structure to portion of $45 million settlement in light of ex ante agreement for such a fee structure); *Synthroid II*, 325 F.3d at 980 (awarding "consumer class counsel 30% of the first $10 million and 25% of the next $10 million," and so forth, of $88 million common fund); *Aranda*, 2017 WL 1369741, at *9 ($76 million common fund); *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 237 (N.D. Ill. 2016) ("Using the *Synthroid II* structure as a general model, the court awards Class Counsel attorney fees as follows: 30% of the first $10

million of the settlement, 25% of the second $10 million, and 20% of the remaining amounts from $20 to $28.79 million (subtracting the $50,000 *cy pres* distribution, the $7,500 in incentive awards, and the $5,152,929.51 in administrative costs from the total $34 million fund).").[14]

But as the range of total common fund awards in these cases show, it is unclear what amount tips a settlement from large to a "megafund." The *Gehrich* settlement, a consumer action where a sliding scale was applied, is about 2.8 times the size of the settlement here, and the *Synthroid II* settlement is about 2.5 times the *Gehrich* settlement—so it is difficult to discern what order of magnitude a settlement must achieve to be eligible for sliding-scale fee consideration. Moreover, Plaintiffs and Wynnychenko have not provided authority suggesting that such a fee structure can *only* be applied in "megafund" settlements.

And while the actual existence of a sliding-scale fee agreement was dispositive to the Seventh Circuit in *Stericycle*, 35 F.4th at 559–63, the focus of the market-rate analysis is not whether an actual agreement exists or what it says, but rather "the terms that *would have been* agreed to . . . *had* negotiations occurred." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 722 (7th Cir. 2001) ("*Synthroid I*") (emphasis added); *see also Gehrich*, 316 F.R.D. at 237 ("[T]he court examines the pertinent factors from an *ex ante* perspective, as if the class members and Class Counsel were negotiating a fee at the outset." (citations omitted)); *but see In re TikTok*, 617 F. Supp. at 940–41 ("*Stericycle* did not create a general presumption in favor of a sliding-scale approach for large cases. Instead, the *Stericycle* court spoke approvingly of

_____

[14] Plaintiffs cite both *Aranda/Birchmeier* and *Gehrich*, ECF Nos. 39 at 12 and 47 at 40–41 and 45, but fail to engage with or even acknowledge either case as a sliding-scale fee case.

using a sliding-scale approach in cases where an actual *ex ante* fee agreement also has adopted a sliding-scale formula." (citing *Stericycle*, 35 F.4th at 563)). Had Plaintiffs been given the opportunity to agree to a sliding-scale fee structure with class counsel in this case, they may well have taken advantage of it. *See, e.g.*, *Gehrich*, 316 F.R.D. at 237 ("[T]he court finds that fully informed and modestly sophisticated plaintiffs [in a Telephone Consumer Protection Act suit] would have bargained for a sliding-scale contingency fee.").

But the Court has not located, and Wynnychenko has not provided, strong support for implementing such a fee structure in a settlement of this size. Despite the wide dollar-value range of cases in which a sliding-scale fee structure has been implemented—demonstrating that district courts have perhaps more discretion to adopt such a fee structure than Plaintiffs and Wynnychenko let on—the Court will not take that path absent clearer guidance from the Seventh Circuit.

#### 3.4.1.4 Percentage Fee

That brings the Court to the central topic of what is an appropriate percentage fee in this case. To their credit, both Plaintiffs and Wynnychenko agree that a percentage-of-the-fund fee is the proper structure, or at least the proper starting point, for any award—an agreement that the Court will adopt. *McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 815 ("[T]he market rate for the legal services provided by class counsel is a contingency fee. . . . The court will award attorneys' fees as a percentage of the common fund because it most closely replicates the market for the legal services provided." (citing *Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986))). But that is where their agreement ends.

After careful consideration of Plaintiffs' and Wynnychenko's points,[15] the Court concludes that a fee of 30% of the net settlement fund— that is, the balance of the fund after Kroll's administration fees, litigation costs, and service awards are paid, *see In re Sears*, 867 F.3d at 793 and *supra* note 8—is a reasonable fee for class counsel. This fee appropriately balances the risk that class counsel assumed in accepting this case against the amount and quality of work they performed and the stage of litigation at which they arrived.

A percentage fee at or near what Plaintiffs have requested would be appropriate in light of the stakes of this case, the recovery achieved, and the substantial risk that class counsel assumed in litigating it. At the time Plaintiffs filed their cases, there was no guarantee that their claims would survive a motion to dismiss, or could successfully be certified as a class, neither of which has been done yet in a federal court. ECF No. 47 at 33. Between the initial complaint and the notice of settlement,[16] only one other district court in the Seventh Circuit had spoken on the sufficiency of the pleadings in a factually similar case—and largely found for the defendants.[17] *Kurowski*, 659 F. Supp. 3d 931 ("*Rush I*"). In *Rush I*, the

---

[15]Despite Plaintiffs' insistence that the Court should dismiss Wynnychenko's objection as mooted by his alternative proposed order, the Court addresses his arguments for the sake of complete analysis.

[16]The initial complaint in the lead case in this action, 22-CV-1253, was filed on October 24, 2022. ECF No. 1. An amended consolidated complaint was filed on January 23, 2023. ECF No. 20. A second amended complaint, the operative complaint in this matter, was filed on May 5, 2023. ECF No. 27. On July 6, 2023, the parties informed the Court that they had settled the case. ECF No. 32.

[17]One other district court granted a motion to dismiss in a similar case in late 2023, after Plaintiffs settled this case. *Hartley v. Univ. of Chicago Med. Ctr.*, No. 22 C 5891, 2023 WL 7386060 (N.D. Ill. Nov. 8, 2023) (granting motion to dismiss ECPA and tort claims). A fair number of similar cases have been remanded to state

plaintiffs raised a claim under the federal Wiretap Act as amended by the Electronic Communications Privacy Act ("ECPA"); a claim of breach of an implied duty of confidentiality; violations of the Illinois Consumer Fraud and Deceptive Business Practices Act; violations of the Illinois Uniform Deceptive Trade Practices Act; and a claim of intrusion upon seclusion. 659 F. Supp. at 934. In March 2023, the district court there granted the defendants' motion to dismiss as to all but the Illinois deceptive trade practices claim.[18] *Id.* at 944. Plaintiffs in the instant case raise similar claims to what the *Rush I* plaintiffs raised. ECF No. 27 at 75–104 (raising intrusion upon seclusion, invasion of privacy, unjust enrichment, breach of implied contract, breach of confidentiality, federal ECPA, breach of healthcare patient confidentiality under Wisconsin and Illinois law, deceptive business practices under Illinois law, and deceptive trade practices claims under Wisconsin and Illinois law). No federal district court has reached the issue of class certification in a health data privacy case like this, as far as the Court is aware. One Maryland state court has denied class certification. *Doe v.*

---

court. *See, e.g., Doe v. Margaret Mary Cmty. Hosp. Inc.*, No. 123CV01655JRSKMB, 2024 WL 701942 (S.D. Ind. Feb. 21, 2024); *Elkins v. Se. Ind. Health Mgmt. Inc.*, No. 123CV01117JRSTAB, 2023 WL 6567438 (S.D. Ind. Oct. 10, 2023); *Doe v. Sarah Bush Lincoln Health Ctr.*, No. 23-CV-2170, 2023 WL 7690179 (C.D. Ill. Nov. 13, 2023); *Doe v. Gundersen Lutheran Health Sys., Inc.*, No. 23-CV-694-WMC, 2024 WL 489327 (W.D. Wis. Feb. 8, 2024).

[18]The *Rush I* plaintiffs subsequently amended their complaint and the defendants again moved to dismiss it, which the district court granted in part in July 2023. *Kurowski v. Rush Sys. for Health*, 683 F. Supp. 3d 836 (N.D. Ill. 2023). The plaintiffs then moved to file a second amended complaint, which the district court granted in part in December 2023. *Kurowski v. Rush Sys. for Health*, No. 22 C 5380, 2023 WL 8544084 (N.D. Ill. Dec. 11, 2023). Both developments took place after this consolidated case settled.

*MedStar Health, Inc.*, No. 24-C-20-000591, 2023 WL 4931348 (Md. Cir. Ct. Mar. 10, 2023).

Plaintiffs are therefore correct that success was far from guaranteed in this case. They are also correct that the $12.225 million non-reversionary settlement fund is a substantial result for the class, though viewed in terms of the per-person recovery, it is a solid but not exceptional result. *See* ECF No. 39 at 13 (comparison table of similar cases). Contrary to Wynnychenko's suggestions, in light of the above-discussed decisions, achieving "efficient and early resolution" of this case does not mean the case was not risky; rather, settlement was a smart way to "avoid[] the risk that the Class would get nothing," a very real possibility in light of the *Rush I* decision. ECF No. 47 at 38. Data privacy class actions like this one, even if ubiquitous now, were novel at the time that Plaintiffs brought the case and negotiated the settlement. *Id.* at 39 ("The fact that many cases had been *filed* is irrelevant; few cases had been settled or even had motions to dismiss decided.").

Wynnychenko's arguments are appealing on their face but ultimately don't hold water. First, it's erroneous to assume that a "rapid" settlement in this case confirms that the parties did not view it as all that risky. It also took two mediation sessions to arrive at the settlement, so "rapid" may not be the most accurate characterization. Before that time, the parties' joint Rule 26(f) plan indicated that Defendant fully intended to file a motion to dismiss. ECF No. 16 at 4, 6–7. Additionally, the settlement is just as easily explained by Defendant viewing Plaintiffs' case as strong and/or wanting to avoid setting unfavorable precedents by litigating this matter (this could be a case of "bad facts make bad law," as the saying goes). *Rush I*, where the plaintiffs have now been allowed to proceed on a second

amended complaint, supports a conclusion that there may be some merit to Plaintiffs' claims. *See supra* note 18. At the same time, the *Rush* case held different significance earlier in this litigation, where it seemed to lend support to Defendant's position. Indeed, Plaintiffs acknowledge that Defendant has "several strong legal defenses" and that there are "difficulties in demonstrating causation and injury." ECF No. 47 at 23–25.

Second, Wynnychenko improperly equates the number of lawsuits filed with the likely outcome of those cases for the filers. Simply because many attorneys are prompted to file lawsuits when alerted to an alarming trend with significant legal implications does not mean that those lawsuits are home-run cases (or that they are meritless). At the time that Plaintiffs filed the original complaint in this matter, there was essentially no case law outlining the applicable pleading standard. It was anyone's guess how a case like this might turn out; the law was not well-settled and proving violations was not straightforward. Attorneys trying to pursue novel causes of action, premised on unfamiliar fact patterns, in multiple jurisdictions, do so at their own risk. As long as the particular species of data privacy claim present in this case is still developing, reducing the fee request too far risks unfairly penalizing Plaintiffs for attempting to develop the law. So in this respect, Plaintiffs' fee request is fair.

At the same time, the Court cannot embrace Plaintiffs' arguments that the time and labor they spent on this case, despite the early stage at which it settled, is commensurate with a 34.5% fee, and for this reason the Court will lower the requested fee. *In re Stericycle*, 35 F.4th at 566 ("A reduction may be warranted if the requested fee award is 'disproportionate to the amount of work expended by class counsel.'" (quoting *Camp Drug*, 897 F.3d at 833)). Wynnychenko does not dispute that class counsel

provided high-quality representation and achieved a favorable outcome for the class, and neither does the Court. But the Court is concerned that class counsel conflates the amount of work that they performed in fact with the amount of work that would have been required of them in this case had it gone the way of *Rush I*, which snagged at the pleadings stage, or further. Viewed from any angle, drafting "a comprehensive and detailed consolidated complaint," "conducting discovery for settlement purposes," and engaging in "detailed, protracted settlement negotiations" including two mediation sessions, ECF No. 39 at 17–19—while a significant body of work—is not the same as defending multiple motions to dismiss, conducting full fact discovery, or litigating summary judgment and class certification.

As detailed above, this case was risky, and the Court has no doubt that Plaintiffs' attorneys worked hard in litigating it. But Plaintiffs and their attorneys opted for an early settlement over more labor-intensive but perhaps more lucrative litigation, and so at the end of the day, the reality is that counsel did not have to expend extraordinary time and effort to deal with the above-average risk that they assumed. *See Gehrich*, 316 F.R.D. at 237 ("Class Counsel's contention that they have devoted substantial resources to the prosecution of this case with no guarantee that they would be compensated for their time or reimbursed for their expenses, . . . similarly fails to persuade. That is in the very nature of plaintiff's contingency work, not of this case in particular." (internal quotation marks and citation omitted)). Reducing the fee reflects this principle. The Court also agrees with Wynnychenko that a smaller award appropriately leaves some upward "breathing room" to award greater fees in cases that involve more work for counsel than this one.

Having concluded that it will lower the fee award from the 34.5% that Plaintiffs request, the Court turns to the question of what an appropriate percentage is. The securities cases that Wynnychenko discusses are somewhat persuasive to the Court. While comparing sophisticated institutional investor plaintiffs with consumer data privacy plaintiffs is rather inapt, the Court agrees in a broad sense with Wynnychenko that the percentage fee that better reflects the market rate is the one that has been haggled over. Plaintiffs' unembellished argument that securities actions are just different from consumer data privacy actions, while true, does not satisfy the Court that consumer data privacy plaintiffs will always be willing to pay their attorneys a fee in the range of 33% to 40% for a settlement achieved without significant litigation. To the contrary, the average layperson understands intuitively that compensation generally increases, or should increase, with effort. Saying that a 33–40% contingent fee reflects the market for consumer data privacy representation through early settlement is self-serving, supply-side rationalization—perhaps plaintiffs agree to this fee because it is what attorneys offer and courts approve, not what plaintiffs would prefer.

Here, empirical data provide some meaningful benchmarks. One study of settlements between 1993 and 2008 found that percentage-fee awards decrease as settlement size increases, and that for settlements of a comparable size to this one—between $8.7 million and $14.3 million gross—fee awards averaged 23.8%. Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. EMPIRICAL LEGAL STUD. 248, 265 (2010). (Coincidentally, 23.8% is also Wynnychenko's revised suggested fee award, though he does not cite this study.) The same study found that for "high risk" consumer actions, the

average fee award was 31.3%. *Id.* A more recent treatise notes that "empirical data on fee awards demonstrate that percentage awards in class actions are generally between 20–30%, with the average award hovering around 25%" and that "fee awards across all case types generally remain in the mid-20% range." 5 WILLIAM B. RUBENSTEIN, NEWBERG & RUBENSTEIN ON CLASS ACTIONS § 15:83 (6th ed. 2024) (footnotes omitted).

Taking all these factors as a whole—the risk inherent in this case, which favors of a higher award; the work that counsel performed, which favors a lower award; and the variety of percentages that have been bargained for by plaintiffs and accepted by courts and parties in a range of comparable actions—the Court finds that a fee of 30% of the net settlement fund is reasonable here. This appropriately "award[s] counsel the market price for legal services," *Camp Drug*, 897 F.3d at 832–33 (citation omitted), while also accounting for "the potential conflict of interest between class counsel and the class." *In re TikTok*, 617 F. Supp. 3d at 939 (citation omitted). In practical terms, this means that Plaintiffs' attorneys will receive $2,824,993.19, a $425,006.81 reduction from the revised request for $3,250,000, which was approximately 34.5% of the $9,416,643.98 net settlement fund. The amount of the reduction will instead be distributed to the class.

### 3.4.1.5 Lodestar Cross-Check

Having balanced a number of factors to arrive at a reasonable percentage fee, the Court is satisfied that the revised fee is not an unwarranted windfall for class counsel, and accordingly will decline to perform a detailed lodestar cross-check. The revised fee is still well above the revised lodestar total of $1,700,586.24 that Plaintiffs submitted, and so the Court is assured that the fee both adequately compensates counsel for

their time and effort *and* rewards their assumption of the risk this case presented. Measuring the revised figure against Plaintiffs' lodestar calculation results in a multiplier of 1.6, which is well within the band of lodestar multipliers accepted within the Seventh Circuit. *In re TikTok*, 617 F. Supp. at 943 ("In practice, most multipliers fall between one and four." (collecting cases)).

That said, the Court has reviewed class counsel's billing records, and briefly addresses several issues with them. First, Wynnychenko's frustration with Plaintiffs' class counsel's redactions on the public-facing version of the billing records is valid. The Court left it to Plaintiffs' counsel to determine the appropriate level of redaction to apply. ECF No. 50 at 16. As Wynnychenko points out, "[b]illing descriptions rarely contain privileged material," and moreover Plaintiffs' counsel knows how to differentiate between privileged and nonprivileged billing information because they have done it in other litigation. ECF No. 52 at 3 (citing *Avgoustis v. Shinseki*, 639 F.3d 1340, 1344–45 (Fed. Cir. 2011)). Plaintiffs' counsel took the Court's gesture of good faith and ran away with it, providing no legal rationale for their wholesale redaction of their billing descriptions. Because Wynnychenko ultimately doesn't contest the redactions, and the Court will not perform a detailed lodestar analysis, the Court does not press this issue further, but Plaintiffs' counsel must do better in the future.

Second, the Court shares Wynnychenko's concerns about the high rates that several of the non-lead attorneys charged, especially since Plaintiffs' counsel has made no attempt at explaining whether their hourly rates are reasonable. *See Montanez v. Simon*, 755 F.3d 547, 553 (7th Cir. 2014) (noting that a fee movant should establish a reasonable hourly rate by

submitting evidence of "the amount the attorney actually bills for similar work" or "evidence of rates charged by similarly experienced attorneys . . . in similar cases" (citing *Johnson v. GDF, Inc.*, 668 F.3d 927, 933 (7th Cir. 2012))). Compounding this problem, some of the high billers appear to have done minimal work; at least one (Michael Kind of Kind Law, who billed over $40,000 worth of work at a rate of $656 per hour) has not entered a notice of appearance or signed a single submission in this case or any of the consolidated cases. ECF No. 51-1 at 31. Others, such as the law firm of Stephan Zouras, include significant billing by multiple attorneys for drafting and reviewing the opposition to the motion to transfer the *Stewart* case from the Northern District of Illinois to this District, which motion was granted, and thus, the opposition rejected, providing no benefit to the class here. *Id.* at 61, 64; *Alistair Stewart v. Advocate Aurora Health, Inc.*, Case No. 23-CV-260, ECF Nos. 32 and 40 (Jan. 9 and Feb. 22, 2023); *see Hensley*, 461 U.S. at 434 ("Counsel . . . should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary . . . ."). But the Court will not wade too far into these issues, as Plaintiffs' attorneys will allocate any fee award among themselves and so can sort out the appropriate compensation for each billing attorney.

### 3.4.2   Expenses

Plaintiffs seek $23,356.02 in litigation expenses. ECF No. 38 at 1. They note that the settlement agreement contemplates that they could seek reimbursement of up to $30,000.00 in such expenses. ECF No. 39 at 20 (citing ECF No. 35-2 at 27). "[T]he court may award . . . nontaxable costs that are authorized by . . . the parties' agreement." Fed. R. Civ. P. 23(h). The Court earlier gave preliminary approval to the settlement agreement and noted this term, ECF No. 36 at 3, and sees no reason to depart from this finding

where the expense reimbursement request is in line with the parties' agreement. Plaintiffs have provided a line-item breakdown of the expenses they have incurred, which includes legal database fees, copies, filing fees, postage, travel, and mediation costs. ECF No. 39-1 at 12. Wynnychenko has not objected to the award of costs. The Court finds that these costs are reasonable and were necessary to the result achieved in this litigation. *Synthroid I*, 264 F.3d at 722 (recognizing a right to reimbursement of reasonable litigation expenses at market rates). Accordingly, the Court will grant Plaintiffs' motion in this respect.

### 3.4.3 Service Awards

Plaintiffs seek $3,500.00 service awards for each of themselves who have served as class representatives. ECF No. 38 at 1; *see also supra* note 1 (listing class representatives); ECF No. 36 at 6–7 ("provisionally find[ing] that [Plaintiffs] . . . will be adequate Class Representatives"). Plaintiffs contend that they have earned these awards by "remain[ing] in this [l]itigation including reviewing and approving the terms of the [s]ettlement [a]greement." ECF No. 39 at 20 (citing ECF Nos. 39-2–39-11 (Plaintiffs' declarations)). Plaintiffs argue that such awards are in line with those that other courts within this District have awarded and therefore are reasonable. *Id.* at 21 (citing *Weninger v. Gen. Mills Operations, LLC*, No. 18-CV-321-JPS, 2019 WL 1746703, at *1 (E.D. Wis. Apr. 18, 2019); *Bills v. TLC Homes Inc.*, No. 19-cv-148-pp, 2020 WL 5982880, at *5 (E.D. Wis. Oct. 8, 2020); *Benoskie v. Kerry Foods, Inc.*, No. 19-cv-684-pp, 2020 WL 5769488, at *5 (E.D. Wis. Sept. 28, 2020); and *Pintor v. Hypro, Inc.*, No. 17-cv-890-pp, 2018 WL 4705847, at *1 (E.D. Wis. Oct. 1, 2018)).

"Because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an

individual to participate in the suit." *Cook*, 142 F.3d at 1016 (citing *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 571 (7th Cir. 1992)). "To determine if an incentive award is warranted, a district court evaluates 'the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation.'" *Camp Drug*, 897 F.3d at 834 (quoting *Cook*, 142 F.3d at 1016).

Wynnychenko does not object to the service awards. The Court similarly has no objection to granting the request. The Court makes this finding in light of its prior endorsement of the parties' agreement to pay service awards at this rate, and also considering Plaintiffs' role in the case as well as the cases Plaintiffs have cited, which tend to establish individual awards of $3,500.00 as reasonable. The Court will grant Plaintiffs' motion in this respect.

**4.     CONCLUSION**

For all the reasons stated herein, Plaintiffs' motion for final approval of the class action settlement in this matter, ECF No. 46, is granted, and the class is certified. To the extent that they are not addressed in the body of this Order, the Court will below incorporate the terms of Plaintiffs' proposed order granting such approval. ECF No. 47-1. Wynnychenko's objection, ECF No. 42, is sustained in part as to the matter of attorneys' fees, and is otherwise overruled or withdrawn. Plaintiffs' motion for attorneys' fees, expenses, and class representative service awards, ECF No. 38, is granted in part, with the fee award reduced as stated herein. This consolidated action and all its member cases will be dismissed.

Accordingly,

**IT IS ORDERED** that Plaintiffs' motion for final approval of the parties' class action settlement, ECF No. 46, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the objections of class members Mary Boryu, Stanley Guokas, Christine Gleason, and Tyler Dorner, ECF Nos. 40, 45-1, 45-2, and 45-3, be and the same are hereby **OVERRULED**;

**IT IS FURTHER ORDERED** that the objection of class member Theodore Wynnychenko, ECF No. 42, be and the same is hereby **SUSTAINED in part** and **OVERRULED in part** as stated in this Order;

**IT IS FURTHER ORDERED** that Plaintiffs' motion for attorneys' fees, expenses, and class representative service awards, ECF No. 38, be and the same is hereby **GRANTED in part** as stated in this Order;

**IT IS FURTHER ORDERED** as follows:

1.      Unless otherwise defined herein, all terms that are capitalized herein shall have the same meaning ascribed to those terms in the Settlement Agreement, ECF No. 35-2.

2.      The Court has jurisdiction over the subject matter of this Litigation, all claims raised therein, and all Parties thereto, including the Settlement Class.

3.      The Settlement Agreement, ECF No. 35-2, is fair, reasonable, adequate and in the best interests of Settlement Class Members.

4.      The Court grants final approval of the Settlement Agreement in full, including but not limited to the releases therein and the procedures for distribution of the Settlement Fund. All Settlement Class Members who have not excluded themselves from the Settlement Class (the "Opt-Out Members") are bound by this Final Approval Order and Judgment.

5. The Parties shall carry out their respective obligations under the Settlement Agreement in accordance with its terms. The relief provided for in the Settlement Agreement shall be made available to the Settlement Class Members submitting valid Claim Forms, pursuant to the terms and conditions in the Settlement Agreement. The Settlement Agreement is incorporated herein in its entirety as if fully set forth herein and shall have the same force and effect of an order of this Court.

**CERTIFICATION OF THE SETTLEMENT CLASS**

6. Solely for purposes of the Settlement Agreement and this Final Approval Order and Judgment, the Court hereby certifies the following Settlement Class:

> All individuals residing in the United States whose Personal Information or health information was or may have been disclosed to a third party without authorization or consent through any Tracking Pixel on Defendant's websites, LiveWell App, or MyChart patient portal between October 24, 2017 and October 22, 2022. Excluded from the Class are Defendant and its affiliates, parents, subsidiaries, officers, and directors, as well as the judges presiding over this matter and the clerks of said judges. This exclusion does not apply to those employees of Defendant and its Related Parties who received Defendant's October 22, 2022 notification regarding its usage of Tracking Pixels.

7. The Court incorporates its preliminary conclusions in the Preliminary Approval Order, ECF No. 36, regarding the satisfaction of Federal Rules of Civil Procedure 23(a) and 23(b). Because the Settlement Class is certified solely for purposes of settlement, the Court need not address any issues of manageability for litigation purposes.

8. The Court grants final approval to the appointment of Shyanne John, Richard Webster, Deanna Danger, James Gabriel, Katrina

Jones, Derrick Harris, Amber Smith, Bonnie LaPorta, Angel Ajani, and Alistair Stewart as Class Representatives, and concludes that they have fairly and adequately represented the Settlement Class and shall continue to do so.

9.      The Court grants final approval to the appointment of Gary M. Klinger and Alexandra Honeycutt of Milberg Coleman Bryson Phillips Grossman, PLLC, located at 227 W. Monroe Street, Suite 2100, Chicago, IL 60606, and Terence R. Coates and Dylan J. Gould of Markovits, Stock & DeMarco, LLC, located at 119 E. Court Street, Suite 530, Cincinnati, OH 45202, as Class Counsel. Class Counsel have fairly and adequately represented the Settlement Class and shall continue to do so.

## NOTICE TO THE CLASS

10.      The Court finds that the Notice Program, set forth in the Settlement Agreement and effectuated pursuant to the Preliminary Approval Order: (i) was the best notice practicable under the circumstances; (ii) was reasonably calculated to provide, and did provide due and sufficient notice to the Settlement Class regarding the existence and nature of the Litigation, certification of the Settlement Class for settlement purposes only, the existence and terms of the Settlement Agreement, and the rights of Settlement Class Members to exclude themselves from the Settlement, to object and appear at the Final Approval Hearing, and to receive benefits under the Settlement Agreement; and (iii) satisfied the requirements of the Federal Rules of Civil Procedure, the United States Constitution, and all other applicable law.

## ATTORNEYS' FEES AND COSTS, SERVICE AWARDS

11.      The Court awards Class Counsel $2,824,993.19 in fees (30% of the net settlement fund as defined herein) and reimbursement of $23,356.02

in expenses. The Court finds these amounts to be fair and reasonable. Payment shall be made from the Settlement Fund pursuant to the procedures in Section X of the Settlement Agreement. Class Counsel shall have sole discretion in allocating the $2,824,993.19 of attorneys' fees among Plaintiff's counsel.

12. The Court awards $3,500 to each Plaintiff as a Service Award. The Court finds this amount is justified by their service to the Settlement Class. Payments shall be made from the Settlement Fund pursuant to the procedures in Section X of the Settlement Agreement.

## RELEASE

13. Each Settlement Class Member, including the Class Representatives, is (1) deemed to have completely and unconditionally released, forever discharged and acquitted Defendant and the Released Persons from all claims arising out of or asserted in the Litigation and all Released Claims under the Settlement Agreement; (2) barred and permanently enjoined from asserting, instituting, or prosecuting, either directly or indirectly, these claims. The full terms of the release described in this paragraph are set forth in Section XV of the Settlement Agreement and are specifically approved and incorporated herein by this reference (the "Release"). In addition, the Class Representatives and, by operation of this Final Approval Order, each Settlement Class Member, is deemed to have waived (i) the provisions of California Civil Code § 1542, which provides that a general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party,

and (ii) any law of any state or territory of the United States that is similar, comparable, or equivalent to California Civil Code § 1542.

14.     The Settlement Agreement and this Final Approval Order and Judgment apply to all claims or causes of action under the Settlement Agreement, and binds the Class Representative and all Settlement Class Members who did not properly request exclusion. The Settlement Agreement and this Final Approval Order and Judgment shall have maximum res judicata, collateral estoppel, and all other preclusive effect in any and all causes of action, claims for relief, suits, demands, petitions, or any other challenges or allegations that arise out of or relate to the subject matter of the Litigation and/or the Complaint.

## OTHER PROVISIONS

15.     The Settlement Fund, consisting of twelve million two hundred and twenty-five dollars and no cents ($12,225,000.00), shall be used to pay all costs of the Settlement, including all payments to Settlement Class Members, Notice and Settlement Administration Costs, the Attorneys' Fees and Litigation Expenses Award to Class Counsel, the Class Representatives' Service Award, and, if applicable, any benefits to the Charitable Healthcare Recipients.

16.     The Settlement Agreement and this Final Approval Order and Judgment, and all documents, supporting materials, representations, statements, and proceedings relating to the Settlement are not, and shall not be construed as, used as, or deemed evidence of, any admission by or against Defendant of liability, fault, wrongdoing, or violation of any law, or of the validity or certifiability for litigation purposes of the Settlement Class or any claims that were or could have been asserted in the Litigation.

17. The Settlement Agreement and this Final Approval Order and Judgment, and all documents, supporting materials, representations, statements, and proceedings relating to the Settlement shall not be offered or received into evidence, and are not admissible into evidence, in any action or proceeding, except that the Settlement Agreement and this Final Approval Order and Judgment may be filed in any action by Defendant or the Settlement Class Members seeking to enforce the Settlement Agreement or the Final Approval Order and Judgment.

18. Consistent with Section XIV of the Settlement Agreement, if the Effective Date does not occur for any reason, the following will occur: (a) the Final Approval Order and Judgment and all of their provisions will be vacated, including but not limited to the Attorneys' Fees and Expenses Award and the Class Representatives' Service Awards, and the Final Approval Order and Judgment will not waive, release, or otherwise impact the Parties' rights or arguments in any respect; and (b) the Litigation will revert to the status that existed before the Settlement Agreement's execution date, and the Parties shall be restored to their respective positions in the Litigation as if the Settlement Agreement had never been entered into. No term or draft of this Settlement Agreement, or any part of the Parties' settlement discussions, negotiations, or documentation will have any effect or be admissible in evidence for any purpose in the Litigation.

19. Without affecting the finality of this Final Approval Order and Judgment, the Court will retain jurisdiction over this Litigation and the Parties with respect to the interpretation, implementation, and enforcement of the Settlement Agreement for all purposes.

20. The Court hereby dismisses this consolidated action and all its member cases in their entirety with prejudice, and without fees or costs except as otherwise provided for herein.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 10th day of July, 2024.

BY THE COURT:

_____

J.P. Stadtmueller
U.S. District Judge